Filed 4/25/13  P. v. Yun CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN LEE YUN et al.,<br><br>    Defendants and Appellants. | B235694<br><br>(Los Angeles County<br>Super. Ct. No. GA078803) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed in part and reversed in part with directions.

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant Bobby Matters.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant John Lee Yun.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Mary Sanchez and Taylor Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Bobby Matters and John Lee Yun appeal their convictions for assault. Matters also appeals his conviction for dissuading a witness. The juries[1] found allegations to be true that (1) Yun's offenses of assault by means likely to produce great bodily injury, and Matters's offenses of simple assault and attempt to dissuade a witness were committed for the benefit of, in association with, or at the direction of a criminal street gang.

Matters contends that the trial court erred, and that reversal is required because the court, (1) improperly admitted his statement to the police obtained during a custodial interrogation; (2) failed to instruct sua sponte on the defense of necessity; (3) imposed an unauthorized sentence for his conviction for dissuading a witness; and (4) wrongly concluded it lacked the discretion to strike the Penal Code section 186.22, subdivision (b)(4) allegation.[2] Matters also contends that his trial counsel rendered ineffective assistance of counsel by failing to seek a reduction of his conviction for dissuading a witness to a misdemeanor offense. We will vacate Matters's sentence for dissuading a witness and remand for resentencing.

Yun, in turn, maintains the trial court committed reversible by (1) failing sua sponte to give accomplice instructions; (2) admitting incendiary photographic evidence; (3) excluding evidence of a hung jury in the trial of defense witnesses. Yun also argues that cumulative errors require reversal and that an enhancement imposed under section 667.5, subdivision (b) must be stricken. We agree only with Yun's final contention, an error the Attorney General concedes. In all other respects, we affirm.

## FACTS AND PROCEDURAL HISTORY

By third amended information, Matters and Yun were charged as follows:

Counts 1 and 3: charged Yun with assault with a deadly weapon (§ 245, subd. (a)(1));

---

[1] Matters and Yun were tried jointly but before separate juries.

[2] Unless otherwise stated, statutory references are to the Penal Code.

2

Count 2: charged Yun with attempted second degree robbery (§§ 664, 211), and also alleged that Yun personally used a deadly weapon (box cutter) in the commission of the offense (§ 12022, subd. (b)(1));

Count 4: charged Matters with dissuading a witness by force or threat (§ 136.1, subd. (c)(1);

Counts 5 and 6: charged Matters and Yun jointly with assault by means likely to produce great bodily injury (§ 245, subd. (a)(1).) As to both counts, the information further alleged that Matters and Yun personally inflicted great bodily injury upon the victims (§ 12022.7, subd. (a)).

As to all counts, the information alleged that the offenses were gang related (§ 186.22, subds. (b)(1)(B), (b)(1)(C), and (b)(4)). Finally, as to counts 1, 2, 3, 5, and 6 it was alleged that Yun had a prior "strike" conviction (§§ 667, subds. (b)-(i); 1170.12, subds. (a)-(d)), a prior serious felony conviction (§ 667, subd. (a)(1)), and that he had served a prior prison term (§ 667.5, subd. (b)). Yun and Matters pleaded not guilty and denied the special allegations.

Yun's jury convicted Yun as charged in counts 1 and 3, and found true the gang allegations. The jury also found true the great bodily injury allegation in count 3. The jury convicted Yun as charged in counts 5 and 6, and found true the gang and great bodily injury allegations. Yun was acquitted of attempted second degree robbery (count 2). In a bifurcated proceeding, the court found true the prior conviction and prior prison term allegations against Yun.

The Matters jury convicted Matters of the lesser offense of witness intimidation in count 4 (§ 136.1, subd. (a)(2).) The jury found the use-of-force allegation not true, but found the gang allegation true. In counts 5 and 6, the jury convicted Matters of the lesser offense of simple assault (§ 240), and found the gang allegations true.

The trial court denied probation. Yun was sentenced to 29 years and four months as follows: As to count 5, the court imposed the midterm of three years, doubled to six years under the "Three Strikes" law, plus 10 years for the gang enhancement and three years for

3

the great bodily injury enhancement. In count 6, the court imposed a consecutive term of one year (one-third the midterm of three years), doubled to two years under Three Strikes law, plus three years and four months (one-third of 10 years) for the gang enhancement and five years for the prior serious felony enhancement. The court struck the great bodily injury enhancement and stayed the one-year prior prison enhancement. The court stayed the sentences as to counts 1 and 3, pursuant to section 654. Yun was ordered to pay various fees and fines, and awarded 665 days of presentence custody credit. (§ 1202.4, subd. (b), § 1202.45.)

The trial court also denied probation as to Matters. He was sentenced to eight years and eight months to life in prison as follows: In count 5, the court imposed the low term of one year. In count 6, the court imposed a term of eight months (one-third the midterm of two years). In count 4, the court imposed a term of seven years to life pursuant to section 186.22, subdivision (b)(4)(C). Matters was ordered to pay a restitution fine (§ 1202.4, subd. (b)), and the court imposed and stayed a corresponding parole revocation fine (§ 1202.45). He was awarded 361 days of presentence custody credit.

**FACTUAL BACKGROUND**

*Prosecution evidence*

*1.      The crimes*

*a.      Will Brown*

On December 29, 2009, at 6:00 p.m., Will Brown, Cono D'Amato, and Micaela Brito went to Smith Park in San Gabriel hoping to join a "pick-up" game of basketball. Two half-court games were ongoing when they arrived. Matters was playing in one game. Brown, who had known Matters since middle school, asked if they could play with his basketball. Matters responded, "Here you go," gave Brown the ball. Matters walked off the court and made a cell phone call, as Brown and his friends began to play.

Soon thereafter, a group of 10–20 men arrived at the park. Most of the men were Hispanic, but the group also included some Asian and Caucasian men. Brown recognized Yun, Christopher Zuniga and Michael Cardenas. Matters joined the group which surrounded

4

Brown and D'Amato. Yun told Brown and D'Amato, "This is our park." Yun announced his gang affiliation, "Sangra gang," and displayed the gang's hand sign. Yun, Matters and the rest of the group advanced toward Brown, who ran towards the handball courts. Five or six men, including Yun, Zuniga, and Cardenas, chased after and surrounded Brown. Zuniga punched Brown in the back of the head. Brown fought back, hitting Cardenas in the face. Cardenas punched Brown in the face, and Yun punched Brown in the ribcage. Other unnamed men hit and kicked Brown "anywhere they could," beating him for about 10 minutes until he blacked out.

Brown regained consciousness and tried to run away, he heard someone yell, "Get that bitch." Eight or nine men, including Yun, Zuniga, and Cardenas, chased Brown and beat him again. During this attack, Yun repeatedly threatened to "cut" Brown. Yun swung a box cutter at Brown's neck and slashed his arm. The men continued beating Brown until he lost consciousness. Matters was involved in the attacks on Brown. When he regained consciousness, Brown saw that the men had surrounded D'Amato. Yun, Matters, Zuniga, and Cardenas were kicking D'Amato. Brown ran to a nearby store and called for help.

Brown suffered a cut on one bicep that required 13 staples, bruises to his stomach, back and legs, and lingering headaches and memory loss. He identified Yun, Matters, Cardenas and Zuniga from a photographic lineup.

Two days after the attack, Brown received three calls on his cell phone during the early afternoon. He did not answer the first call. Brown answered the second call, but the caller said nothing. The third call was from Matters. Referring to Yun by his gang moniker, "Chino," Matters told Brown that "if you don't change your story about Chino, your family, your sister's boyfriend's family, and your house is [sic] all at risk," and "they were going to kill [him.]" In fear for his own and his family's safety, Brown called the police. San Gabriel Police Officer Ricky Nakamura met with Brown that day and later confirmed that the call was made from Matters's cell phone.

5

### b. *Evidence admitted only against Matters*

After he met with Brown, Nakamura went to Matters's house. He asked if Matters had called Brown, which Matters denied. Nakamura "proceeded to ask [Matters] further questions in regards to contacting . . . Brown;" Matters persisted in denying that he had called Brown. Nakamura ultimately arrested Matters.

Nakamura interviewed Matters at the police station after advising him of his *Miranda*[3] rights. Matters waived his rights and agreed to speak to Nakamura. He explained that Yun had called him earlier that day and instructed him to call Brown and tell him to "switch up his story and to not get [Yun] busted." Matters called Brown and relayed Yun's message. He denied having threatened Brown or his family, saying he "just basically was a mediator between [Yun and Brown] in order to help his friend [Yun] out." Matters never said he feared Yun or that he was afraid of what might happen to him if he didn't call Brown.

### c. *Cono D'Amato*[4]

D'Amato testified that when the group first approached him and Brown, Matters asked D'Amato "where [he] was from," meaning whether D'Amato was in a gang. D'Amato told him, "I don't bang." Matters asked D'Amato if he had written on the ground, poles or tree near the basketball courts. D'Amato said he had not. Matters told D'Amato to, "Back up your shit. Back up your shit." Matters then walked behind D'Amato who was hit in the head by someone he did not see. D'Amato fell down and several men kicked and stomped on his head until he lost consciousness. When D'Amato awoke the men "rushed" him again. Someone asked D'Amato if he was from the "Lomas" gang, a rival gang of Sangra's, which D'Amato denied. Brito helped D'Amato get up, but two men rushed him again. Yun approached D'Amato, identified himself as "Chino," flashed a gang sign for "Avenues" and yelled, "Sickos." He demanded D'Amato's wallet, but D'Amato said he left

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694].

[4] D'Amato refused to testify at trial. His testimony from preliminary hearings in the Zuniga/Cardenas and Yun/Matters actions was read at trial.

it in the car.  Yun swung a box cutter at D'Amato.  D'Amato jumped back to avoid being stabbed and ran across the street to get help.

D'Amato suffered cuts to his head and swelling to his ear and head as a result of the attacks.  He identified Yun as "Chino," the man with the box cutter, from a photographic lineup.  He also identified Zuniga as having been present when he was attacked, but said Zuniga had not hit or kicked him.  Zuniga backed away when Yun swung the box cutter at D'Amato.  D'Amato testified that Matters was present during the attack.  He said Matters had not gone after Brown, but had stayed with D'Amato, although Matters "didn't say or do anything."

####    d.    Micaela Brito

Brito's testimony was largely consistent with the testimony given by Brown and D'Amato.  While Brito and Brown played ball, D'Amato squatted down by a basketball pole and appeared to draw or write something on the ground with his finger.  Brito saw Matters take out his cell phone.  Shortly thereafter, a group of eight to 15 men arrived at the park, some of whom "jumped" D'Amato and some of whom chased Brown.  Brito did not see anyone with a weapon.

### 2.    Jail cell graffiti

On January 2, 2010, Yun was in custody in a cell at the San Gabriel Police Department.  At about 5:30 p.m., Nakamura discovered gang graffiti inside the jail cell.  The graffiti was not there prior to Yun's custody.

### 3.    Gang Evidence

San Gabriel Police Detective Fabian Valdez testified as the prosecution's gang expert.  Valdez testified about the Sangra gang's history, make-up and culture.  The gang's primary activities range from vandalism to multiple homicides.  Valdez explained that Smith Park was territory claimed by the Sangra gang.  One clique of the Sangra gang was the "Sickos" clique.  The gang allowed some affiliated tagging crews to draw graffiti in its territory, specifically, the "F.T.S.," "K.F.T.," "D.F.W.," and "4U2C" crews.  But if an unaffiliated

tagging crew came into the gang's territory without permission, the gang would retaliate with violence.

According to Valdez, Yun was an admitted and senior member of the Sangra gang. Cardenas was also an admitted member of that gang. Zuniga was, "at minimum," an associate of Sangra, and he was headed "down the path of becoming a gang member." Matters was not a member of the Sangra gang. Brown, who said he was or had been the head of the K.O.A. tagging crew, told Valdez that Matters was a member of the D.F.W. tagging crew, affiliated with the Sangra gang. Matters had previously been arrested for vandalizing wet cement with the name of a rival tagging crew, with the name crossed out. In gang culture that meant disrespect and a threat to kill. Matters had also been arrested in possession of tagging tools, after marking up a trash can (with a nongang related word).

Based on a hypothetical posed to him patterned on the circumstances of the attacks on Brown and D'Amato at the park, and the phone call to Brown, Valdez opined that the offenses were "done for the benefit, at the association [sic] and direction of the gang," and committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Gangs survive by being respected by other gangs and by being feared in the community. Gangs do not tolerate disrespect. The attacks at issue here promoted the Sangra gang in that they "reinforce[d] the intimidation . . . the gang needs to survive," instilling fear in the community. Valdez opined that someone present at the scene when gang members committed a crime who tried to leave, would be at risk of physical harm. Matters could have faced retaliation from the Sangra gang had he left the scene during the attacks on Brown and D'Amato, and similarly would face retaliation for not participating in the assaults.

Valdez testified that graffiti reflecting D'Amato's moniker, "Decoy" and the tagging crew initials, "T.F.O.C." were drawn in the park before the attacks. He opined that this graffiti likely motivated the attacks on Brown and D'Amato because "T.F.O." was not associated with the Sangra gang and the "tag" would be "the equivalent of a declaration of war" between rival gangs. He also testified that threatening a witness "to change his story"

8

would be done for the benefit of, in association with or direction of the criminal street gang" and "done with the specific intent to promote, further, or assist any criminal conduct by gang members." Such threats help gang members and "sends a message that they are able to get away with certain crimes and sway people to not testify against them."

*Defense Evidence*

1. *Taylor Ruddell and Kohana Tom*

Taylor Ruddell and Kohana Tom are Yun's friends. Ruddell and Tom were walking by the park on December 29, 2009 and saw Yun standing alone. They saw Brown and another man approach Yun and speak to him. The next thing they knew, the men had "jumped" Yun who curled into a ball and did not fight back. Zuniga and Matters were also at the park. Tom did not tell anyone what he saw at the park until he was subpoenaed by Yun's attorney.

2. *Zuniga and Cardenas*

Zuniga and Cardenas testified that they were at the park playing basketball with Matters. Zuniga borrowed Matters's phone to call Yun to tell him to bring a handball to the park. Zuniga, Cardenas and Matters resumed their game, and Yun arrived shortly thereafter.

While he was playing, Zuniga heard a commotion. He saw that someone was being "beat up" by the handball courts. He saw Brown, D'Amato and a woman. He heard Brown or D'Amato make a racial slur to or about Yun. One of them said, this is "T.F.O." and the two men began fighting Yun, who fell and "balled up." Zuniga, Cardenas and Matters ran over to help Yun. Zuniga hit Brown in the back of his head. Zuniga and Cardenas kicked D'Amato while Yun ran away. When Brown tried to escape, Zuniga, Cardenas and Yun chased him. Zuniga never saw anyone with a blade or knife.[5]

---

[5] Zuniga's trial ended in a hung jury, after which Zuniga pleaded no contest to assault. Zuniga later explained that he did not want to go through another trial, but decided to enter a plea because he wanted to "get this thing over."

9

Cardenas testified that he pulled out a knife during the fight and swung it at Brown to scare him off. Cardenas did not intend to cut Brown, but Brown got cut by the knife when he charged at and punched Cardenas. After the fight Cardenas turned himself into the police. He had told the police he knew nothing about the incident because he was afraid, and because his girlfriend was several months pregnant.[6]

### 3.    *Matters*

Matters testified that he had been a member of the D.F.W. tagging crew, but ended his association with that crew four months before the assaults. On December 29, 2009 Matters was playing basketball at the park when Brown, D'Amato and Brito drove up. As the car pulled up beside him, Brown asked Matters, "What's up?" in a friendly manner, and Matters and the three individuals engaged in a conversation about tattoos. Brown, D'Amato and Brito asked Matters if they could play basketball with him. Matters played with Brown and Brito. D'Amato did not play; he had a rock in his hand and was "tagging on the floor" of the basketball court.

Matters stopped playing when his girlfriend called, and went to get a drink of water. As he returned to the basketball court, Matters saw Yun drive past the park and park behind D'Amato's car. Yun got out of the car and walked toward the basketball court followed by a group of 10 people, including Zuniga and Cardenas. As he walked, Yun said, "Sangra" and threw up gang signs. Yun and the others approached Brown and D'Amato on the basketball court. Zuniga asked Brown if he was from "T.F.O." Brown said, "No." Cardenas responded, "'I know that you're from T.F.O. I seen it all over your MySpace and Facebook.'" Zuniga then struck D'Amato in the face, and Brown "took off running." Some members of the group, including Cardenas, Zuniga, and Yun followed Brown. The others continued to assault D'Amato for about five minutes. Matters denied participating in any

---

[6] Cardenas was tried with Zuniga. At trial, Cardenas had two witnesses testify that he had been with them, not at the park. He asked the witnesses to lie because he wanted to be at home for his girlfriend. After the mistrial, Cardenas pleaded no contest.

assault or acting as a lookout. He did not see anyone with a weapon. He did not see Yun pull out a box cutter and cut anyone. Matters denied having told anyone to, "'back up your shit,'" or accusing anyone of "'writing on poles.'" He claimed he left the park while the attack on D'Amato was ongoing. Matters did not see the attack on Brown and did not know he had been stabbed. In Matters's view, the leaders of the attacks were Cardenas and Zuniga.

Shortly after the incident, Matters received an unexpected call from Yun, who had never called Matters before. Yun, who was upset, instructed Matters to "switch up [his] story and [Yun] better not be in it." Matters understood Yun to mean he should not mention Yun's name if asked about the events in the park. Matters felt threatened by Yun. Yun also told Matters to call Brown and give him the same message. Yun learned that Matters did not have Brown's phone number, and told him he would call him back and said Matters "better pick up." Yun called back a few minutes later with Brown's number. He told Matters to call Brown and said he knew Brown was home because he had just called the number.

Matters called Brown, but said nothing when Brown answered the phone. Matters called Yun and told him, "'nobody picked up.'" Yun told Matters he was lying; Brown had answered the phone when Yun called. He told Matters to call again and "not to lie to him." Yun threatened to put Matters "in the same spot that [Brown was] in" if he lied and did not call Brown. Matters then called Brown as instructed. He told Brown, "'Chino said you better switch up your story and he better not get busted.'" Brown hung up. Matters claimed he did what Yun told him to do because he was afraid for his own and his family's safety. Matters was afraid of Yun, a member of the Sangra gang, and believed Yun was threatening him.

Matters testified that two months before trial he was attacked by Joey Leal, another member of the Sangra gang, and another man. The incident ended only when someone drove up honking and threatening to summon the police. Leal accused Matters of "snitching on Chino" and told him, "'This will not be the end of it. Matters reported the Leal incident to the police.

In 2005, Matters had problems with a Sangra gang member who had broken the windows of his girlfriend's car. Matters got angry and broke the gang member's mother's car window. At the time he was so angry he had not thought about the gang implications of what he had done, and was "just acting on [his] anger." When his anger ebbed, he had time to think and was now afraid of retaliation. At trial, Matters remained afraid of the Sangra gang.

Matters testified about some conflicting statements he made to the police. He said when he had been sitting on the curb outside his house and Nakamura drove up (throwing dust in his face), Matters at first denied calling Brown because he was intimidated by Nakamura. Later at the police station, however, Matters told Nakamura the truth because Matters no longer felt threatened by Nakamura. Matters explained that Yun ordered him to call Brown, and asked if he could file a police report against Yun, whom he admitted being afraid of. Matters then repeated his statements to another officer.

## DISCUSSION

1. *The trial court did not err by denying Matters's motion to suppress—his initial statements were not obtained in violation of <u>Miranda</u>.*

Matters contends the trial court erred by admitting his initial statements to Nakamura, in which he denied calling Brown. Matters maintains he was subjected to custodial interrogation without first being informed of his *Miranda* rights.

    *a.*    *Background*

During trial, Matters sought to exclude the "set of statements" he made to Nakamura at his house before his arrest. He argued that he was in custody and that Nakamura was required to give him *Miranda* warnings before questioning him. The court held a hearing on the motion to suppress at which Officers Michael Munoz and Nakamura testified as follows:

On the afternoon of December 31, 2009, Munoz was on duty when he saw Matters's brother (brother) walking. Munoz asked brother if Matters was home, and brother said he was. Munoz asked if he could walk with brother to their house to see if Matters would talk to him. At the house, Munoz stayed outside while brother went in. Munoz saw Matters on

12

the couch and asked him to come outside and talk to him. Matters agreed and came out to the curb. Munoz did not draw his gun, nor did he handcuff or touch Matters in any way. He told Matters "he wasn't under arrest. He wasn't in trouble." Munoz asked Matters to sit on the curb, and stood in front of him. Munoz called Nakamura and engaged in "small talk" with Matters about his involvement in the incidents at the park while they waited for Nakamura. Munoz did not know that Matters was a suspect, only that he was "involved in that group of people," and that he had made a threatening call to Brown.

Nakamura arrived 15 minutes after Munoz called him. When he drove up, Nakamura saw Matters sitting on the curb and Munoz standing next to him. Matters was not in handcuffs. Munoz did not have his weapon drawn, and Nakamura did not draw his weapon. Nakamura spoke briefly with Munoz, and then asked Matters if he had called Brown. Nakamura stood in front of Matters, questioning him, while Munoz stood nearby and behind Matters. Nakamura spoke to Matters for about 10 minutes about the "Brown matter." Nakamura did not tell Matters he had the freedom to leave or to refuse to answer questions. In Nakamura's mind, Matters was "a suspect in the [Brown] matter." After questioning him, Nakamura placed Matters in handcuffs, under arrest.

Based on the officers' testimony, and relying on *People v. Farnam* (2002) 28 Cal.4th 107, the trial court found that Nakamura had not conducted a custodial interrogation of Matters. Thus, no *Miranda* warning had been required.[7]

---

[7] Specifically, the court explained that "[*Farnam*] states in part that . . . the term interrogation refers to any words or actions on the part of the police that are reasonably likely to elicit an incriminating response. It does not extend to inquiries that are limited in purpose in identifying a person found under . . . suspicious circumstances or near the scene of a recent crime. [¶] . . . [T]he court [in *Farnam*] said that the term custody does not include temporary detention for investigation where an officer detains a person to ask a moderate number of questions to determine his identity and try to get information confirming or dispelling the officer's suspicion. [¶] In this situation we have to look at the totality of the circumstances to determine whether or not Mr. Matters was in custody. And from the testimony that we have . . . Officer Munoz went to the house and asked to speak to him. He never touched him or put him in handcuffs or took him into custody in any way. [¶] He asked him to step

At trial, Nakamura testified that he went to Matters's home after speaking with Brown about the threatening phone call. Nakamura asked Matters if he had made any telephone contact with Brown; Matters denied that he had. Nakamura continued to ask Matters more questions, and Matters continued to deny having called Brown. Nakamura arrested Matters.

During closing argument, the prosecutor argued that Matters's initial denial that he had called Brown was "important," and pointed to the instruction stating that misleading statements may be evidence of a defendant's guilt. The prosecutor argued that Matters's consciousness of guilt was evidenced by the fact that he misled the police to try to persuade them that he did not call Brown, then later changed his story.

b.      *Matters's motion to suppress was properly denied because he was not in custody when questioned by Nakamura.*

Under *Miranda,* "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (384 U.S. at p. 444.) "*Miranda* become[s] applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' [Citation.]" (*Berkemer v. McCarty* (1984) 468 U.S. 420, 440 [104 S.Ct. 3138, 82 L.Ed.2d 317].) But, "'[a]bsent "custodial interrogation," *Miranda* simply does not come into play.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.)

---

outside and then asked him some questions while he was seated on the curb. The inquiry did not lead to what would be considered a custodial interrogation because he is simply asking about his involvement in an incident. [¶] Likewise, Officer Nakamura arrived at the scene and, again, [Matters] was not placed in handcuffs. He was told as a matter of fact that he was not under arrest, and the questioning by Officer Nakamura, again did not amount to [a] . . . custodial interrogation. [¶] In that situation Officer Nakamura arrived at the scene, saw [Matters] seated on the curb, and asked him questions regarding his involvement to . . . confirm the officer's suspicion regarding [Matters's] involvement in a crime, and I don't think it rises to the level of a custodial interrogation."

14

"Custody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal arrest? [Citations.] The totality of the circumstances surrounding an incident must be considered as a whole. [Citation.] Although no one factor is controlling, the following circumstances should be considered: '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403 (*Pilster*), fn. omitted.) "Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*Id*. at pp. 1403–1404.)

The determination of whether an individual is in custody is a mixed question of law and fact. (*Pilster*, *supra*, 138 Cal.App.4th at p. 1403.) We defer to the trial court's findings of fact if they are supported by substantial evidence, but independently decide whether, given those facts, "'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [Citation.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400; *Pilster*, at p. 1403.) Here, the pertinent factors support the trial court's conclusion that the interrogation of Matters was not custodial.

First, Matters was specifically told he was not under arrest, and agreed to come out and talk to Munoz who did not touch him, did not draw his weapon and assured Matters he was not in trouble.

Second, the entire contact between Matters and both Munoz and Nakamura lasted about 25 minutes, the first 15 of which involved Munoz's "small talk" with Matters, not

15

about the phone call to Brown, but regarding Matters's involvement in the incidents at the park.

Third, the ratio of officers to Matters was two to one, and there is no evidence the officers' demeanor was aggressive, threatening or anything short of professional.

Fourth, the conversation took place in a familiar location just outside of Matters's own home, in public view of his family and neighbors. "[The] exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the [defendant's] fear that, if he does not cooperate, he will be subjected to abuse." (*Berkemer v. McCarty*, *supra*, 468 U.S. 420, 438.)

Fifth, although Nakamura questioned Matters specifically about the calls to Brown, the fact that officer has focused suspicion is "not relevant" to determining whether a suspect is in custody for purposes of *Miranda*. (*Stansbury v. California* (1994) 511 U.S. 318, 326 [114 S.Ct. 1526, 128 L.Ed.2d 293].) Neither officer drew a weapon or handcuffed Matters, and both spoke with Matters for only a brief time.

Although Matters was not specifically told he was free to leave, nor advised that he did not have to answer the officers' questions, the record establishes that, barring some aggravating circumstance not present here, a reasonable person would conclude the circumstances of Matters's questioning were not tantamount to formal arrest. The trial court properly denied the motion to suppress.[8]

2.      *No necessity instruction was required.*

Matters contends that the trial court erred in failing to instruct the jury sua sponte on the elements of a necessity defense.

"[The] court's duty to instruct, sua sponte, on a particular defense arises '" only if it appears the defendant is relying on such a defense, or if there is substantial evidence to support such a defense and the defense is not inconsistent with defendant's theory of the

---

[8] Our conclusion renders it unnecessary for us to address Matters's assertion that the totality of the circumstances reveals that he did not knowingly and intelligently waive his *Miranda* rights.

16

case.'"'" (*People v. Maury* (2003) 30 Cal.4th 342, 424.)  Necessity is an affirmative defense (*People v. Kearns* (1997) 55 Cal.App.4th 1128, 1134–1135), on which the defendant bears the initial burden of proof as to all elements.  (See *People v. Salas* (2006) 37 Cal.4th 967, 971.)  "To justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency. [Citations.]" (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.)  The significant peril to be avoided must be imminent.  (*People v. Galambos* (2002) 104 Cal.App.4th 1147, 1162–1163.)

"By definition, the necessity defense is founded upon public policy and provides a justification distinct from the elements required to prove the crime.  [Citation.]  The situation presented to the defendant must be of an emergency nature, threatening physical harm, and lacking an alternative, legal course of action.  [Citation.]  The defense involves a determination that the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged.  [Citation.]  Necessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime.  [Citations.]  [¶]  An important factor of the necessity defense involves the balancing of the harm to be avoided as opposed to the costs of the criminal conduct.  [Citation.]  Unlike duress, the threatened harm is in the immediate future, which contemplates the defendant having time to balance alternative courses of conduct.  [Citation.]" (*People v. Heath* (1989) 207 Cal.App.3d 892, 900–901.)

Matters failed to establish an entitlement to a necessity instruction for at least five reasons.  First, he denied having engaged in illegal conduct.  Matters denied he had tried to intimidate or dissuade Brown from testifying.  Rather, he admitted calling Brown only in order to relay Yun's message.  When interviewed by Nakamura, Matters said he "basically was a mediator between [Yun and Brown] in order to help his friend [Yun] out."  Similarly,

17

at trial, Matters testified that he relayed Yun's message, telling Brown that, "Chino said you better switch up your story and he better not get busted." Matters did not maintain that he was forced to commit an illegal act in order to prevent a greater wrong; a call to relay a friend's message is not an illegal act. Accordingly, Matters never claimed he violated the law out of necessity. (See *People v. Pepper*, *supra*, 41 Cal.App.4th at p. 1036.)

Second, Matters had legal "alternative courses of conduct" available to enable him to avoid any perceived harm of retaliation from Yun or the Sangra gang. (*People v. Heath*, *supra*, 207 Cal.App.3d at p. 901; *People v. Pepper*, *supra*, 41 Cal.App.4th at p. 1035.) "'The necessity defense is very limited and depends on the lack of a legal alternative to committing the crime. It excuses criminal conduct if it is justified by a need to avoid an imminent peril and there is no time to resort to the legal authorities or such resort would be futile.' [Citation.]" (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1164.) Here, Matters could have: (1) explained Yun's threats and asked Brown to pretend that Matters did as Yun instructed, (2) lied to Yun and told him he called Brown as instructed without actually making the call, since there is no evidence that Yun followed up to ensure that Matters made the call, or (3) called the police and reported Yun's threat. Any one of these alternatives would have prevented the perceived harm Matters claimed he was trying to prevent—that of physical harm to himself or his family.

Third, the evidence does not establish that Matters or his family was in imminent danger of retribution. Virtually the only evidence that Matters faced a "significant or imminent evil" came from his self-serving testimony that Yun threatened him and that he was afraid of Yun. The record contains no independent evidence of Yun's threats. There is no indication that Matters told Nakamura or anyone that Yun threatened him, that he was afraid of Yun, or that he was "afraid of what could happen to him if he didn't make that phone call [to Brown]." But, even if Yun did threaten Matters, such threats would relate only to the possibility of future retaliation, not an imminent evil. "As a matter of public policy, self-help by lawbreaking and violence cannot be countenanced where the alleged danger is merely speculative and the lawbreaker has made no attempt to enlist law

18

enforcement on his side." (*People v. Miceli* (2002) 104 Cal.App.4th 256, 268.)  Thus, "'[t]he defense of necessity is inappropriate where it would encourage rather than deter [lawbreaking].  [Lawbreaking] justified in the name of preempting some future, necessarily speculative threat to life is the greater, not the lesser evil.'"  (*Ibid*.)

Fourth, Matters himself substantially contributed to the emergent nature of the situation.  According to Brito, Matters made a call after he noticed D'Amato drawing on the ground at the park.  Shortly thereafter, Yun and the other men arrived and the attacks began.  Thus, Matters' own actions initiated the confrontation between Yun, Brown, and D'Amato that resulted in the subsequent charges that led to the predicament in which Matters found himself.

Fifth and finally, the defense of necessity was incompatible with the defense theory of the case.  Ruddell and Tom testified that Brown and someone else attacked Yun who did not fight back.  Zuniga and Cardenas testified that Brown and D'Amato insulted and attacked Yun.  Matters testified that Yun did not participate in the assaults, and that he never saw Yun with a box cutter, nor did he see Yun cut anyone.  He agreed that Cardenas and Zuniga appeared to have been the instigators of the attacks.  In sum, the defense theory was that Yun was a victim of or uninvolved in the attacks.  An instruction on necessity would undermine that theory.  Accordingly, the court had no duty to instruct on the defense. (*People v. Maury*, *supra*, 30 Cal.4th at p. 424; *People v. Celis* (2006) (2006) 141 Cal.App.4th 466, 474–475 [no duty to instruct on a defense inconsistent with defendant's theory of the case].)

*3.*     *Matters received an unauthorized sentence for dissuading a witness.*

In count 4, Matters was charged with dissuading a witness by force or threat in violation of section 136.1, subdivision (c)(1).  The information also alleged a gang enhancement, under section 186.22, subdivision (b)(4).  The jury acquitted Matters of the charged offense, convicting him instead of the lesser offense of dissuading a witness in violation of section 136.1, subdivision (a)(2), but found true the gang enhancement under section 186.22, subdivision (b)(4).  Matters was sentenced to seven years to life for dissuading a witness under the alternative sentencing scheme for gang-related offenses.

19

(§ 186.22, subd. (b)(4)(C).)  He contends that section 186.22, subdivision (b)(4)(C) is inapplicable here because the offense did not involve a threat to the witness.  We agree.

Section 186.22, subdivision (b)(4) provides that "[a]ny person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of:  [¶] . . . [¶]  (C) Imprisonment in the state prison for seven years, if the felony is . . . *threats to victims and witnesses, as defined in Section 136.1*."  (Italics added.)

Here, the trial court relied on section 186.22, subdivision (b)(4)(C) to impose a term of seven years to life.  Imposition of this sentence is permissible only if Matters was convicted of "threats to victims and witnesses, as defined in Section 136.1."  (*Ibid.*)  Matters maintains he was convicted only of attempting to dissuade a witness from testifying, not of attempting to do so with threats.  The Attorney General asserts that the phrase "threats to victims and witnesses" refers to section 136.1 generally, and that any conviction under this statute permits imposition of the indeterminate sentence.

Section 136.1 defines certain offenses involving persuading, preventing or attempting to persuade or prevent a witness or victim from reporting a crime or testifying at trial.  Section 136.1, subdivision (a) prohibits a person from knowingly and maliciously preventing or dissuading a witness or victim from attending or testifying at trial, or attempting to do so.  Subdivision (b) prohibits preventing or dissuading a witness or victim from (1) reporting a crime, (2) causing an accusatory pleading to be sought and prosecuted, or (3) arresting or seeking the arrest of any person in connection with the crime.  Both subdivisions (a) and (b) offenses are "wobblers," i.e., permitting either a jail or prison sentence.  Subdivision (a) and (b) each carves out subdivision (c) as an exception to its provisions.

Section 136.1, subdivision (c) necessarily elevates a violation of either subdivision (a) or (b) into a felony if "(1) . . . the act is accompanied by force or by an express or implied

20

threat of force or violence, upon a witness or victim or any third person or the property of any victim, witness, or any third person." A violation of section 136.1, subdivision (a) or (b) is a lesser offense of subdivision (c), because subdivision (c) requires a violation of subdivision (a) or (b) plus the use of force or threat. (*People v. Upsher* (2007) 155 Cal.App.4th 1311, 1321; *People v. Brenner* (1992) 5 Cal.App.4th 335, 340–341.) "[A] defendant who attempts to dissuade a witness from testifying is guilty of either a misdemeanor or a felony, but [when that] attempt is accompanied by an express or implied threat of force, [the defendant] is guilty of a felony with an increased term of imprisonment." (*People v. Lopez* (2012) 208 Cal.App.4th 1049, 1064 (*Lopez*).)

"The Sixth and Fourteenth Amendments to the United States Constitution preclude a trial court from imposing a sentence above the statutory maximum based on a fact, other than a prior conviction, not found to be true by a jury. (*Cunningham v. California* (2007) 549 U.S. 270, 274–275 [127 S.Ct. 856,  L.Ed.2d  ]; *Blakely v. Washington* (2004) 542 U.S. 296, 303–304 [124 S.Ct. 2531, 159 L.Ed.2d 403]; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [120 S.Ct. 2348, 147 L.Ed.2d 435] [(*Apprendi*)].) Whether a defendant used an express or implied threat of force when attempting to dissuade a witness from testifying is a question of fact that subjects the defendant to a greater sentence. Accordingly, *Apprendi* and its progeny require the jury find this fact true beyond a reasonable doubt." (*Lopez*, *supra*, 208 Cal.App.4th at p. 1064.)

Matters was charged with—but not convicted of—a violation of section 136.1, subdivision (c). The jury rejected the allegation that Matters used force or threat, or that he threatened to use force or violence, in the commission of the offense.[9] Instead, Matters was

---

[9] The jury was instructed as follows:

"**2622. Intimidating a Witness (Pen. Code, § 136.1(a) & (b))**

"Defendant BOBBY MATTERS is charged in Count FOUR with intimidating a witness in violation of Penal Code section 136.1.

"To prove that the defendant is guilty of this crime, the People must prove that:

convicted of the lesser offense of attempting to dissuade Brown from testifying.  (§ 136.1, subd. (a)(2).)  Section 186.22, subdivision (b)(4)(C) permits imposition of a life sentence only when the underlying offense is a felony involving "threats to victims and witnesses, as defined in Section 136.1."  Absent a jury finding of an express or implied threat of force

"1.      The defendant maliciously tried to prevent Will Brown from attending or giving testimony at Jury Trial;

"2.      Will Brown was a witness;

"AND

"3.      The defendant knew he was trying to prevent Will Brown from attending or giving testimony at trial[,] and intended to do so.

"A person acts *maliciously* when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice.

"As used here, *witness* means someone:

"•      Who knows about the existence or nonexistence of facts relating to a crime;

"•      Who has reported a crime to a peace officer or prosecutor;

"OR

"•      Who has been served with a subpoena issued under the authority of any state or federal court.

"It is not a defense that the defendant was not successful in preventing or discouraging the witness."

**"2623.  Intimidating a Witness:  (Pen. Code, § 136.1(c))**

"If you find defendant BOBBY MATTERS guilty of intimidating a witness, you must then decide whether the People have proved the additional allegation that the defendant used or threatened to use force.

"To prove this allegation, the People must prove that:

"The defendant used force or threatened, either directly or indirectly, to use force or violence on the person or property of a witness or any other person.

"The People have the burden of proving this allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that this allegation has not been proved."

pursuant to section 136.1, subdivision (c), Matters's conviction does not qualify for a life sentence under section 186.22, subdivision (b)(4)(C).

Relying on *People v. Neely* (2004) 124 Cal.App.4th 1258 (*Neely*), the Attorney General argues that the reference to "section 136.1" in section 186.22, subdivision (b)(4)(C) is not limited to any particular subdivision of that statute, and should be construed as including all the offenses set forth in section 136.1. We disagree. In *Neely*, the defendant argued that a prior conviction of violating section 136.1, subdivision (a)(2) did not qualify as a serious felony under section 1192.7, subdivision (c)(37). Section 1192.7, subdivision (c)(37) defines "intimidation of victims or witnesses, in violation of Section 136.1" as a serious felony. Noting that no specific offense in section 136.1 mentions "intimidation," *Neely* concluded that the phrase "intimidation of victims or witnesses" in section 1192.7, subdivision (c)(37) merely described the entirety of section 136.1. (*Neely*, at p. 1266.)

But section 186.22, subdivision (b)(4)(C) differs from section 1192.7, subdivision (c)(37). We conclude that the requirement of force or threat in section 136.1 is specifically limited to violations of subdivision (c) which explicitly and unambiguously creates a statutory distinction between offenses that require force or threat and offenses that do not. We recognize that at least one court has found that, in enacting section 186.22, subdivision (b)(4), the Legislature intended dramatically to increase punishment for all gang-related offenses, including the "wobbler" of ordinary attempted witness dissuasion. (*People v. Galvez* (2011) 195 Cal.App.4th 1253, 1256.)[10] But we cannot ignore the clear language of sections 186.22, subdivision (b)(4)(C) and 136.1.

---

[10] In *People v. Galvez*, *supra*, 195 Cal.App.4th 1253, the defendant was convicted of attempted witness dissuasion (§ 136.1, subd.(b)(1)), and assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1)), and the jury found both offenses were committed for the benefit of or in association with a criminal street gang (§ 186.22, subds. (b)(1), (b)(4)(C)). (*Galvez*, at pp. 1256–1257.) There, in contrast with the instant action, the attempted witness dissuasion involved a physical assault by defendant and other gang members, who punched the victim in the face, and kicked him in the head, side and leg. (*Id.* at p. 1257.) *Galvez* did not address the issue here, whether 186.22, subdivision (b)(4)(C) was

23

In addition, as we observed above, any other interpretation of these statutes raises problems under *Apprendi*, which requires that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum . . . be submitted to a jury, and proved beyond a reasonable doubt." (530 U.S. at p. 490.) The jury was asked if Matters violated section 136.1, subdivision (c), and found he had not. In *Apprendi*'s terms, subdivision (c) does not describe a sentencing factor applicable to a violation of subdivision (a). Rather, section 136.1, subdivision (c) describes a greater offense and provides for a more severe punishment than is authorized for a conviction under subdivision (a). The trial court relied on section 186.22, subdivision (b)(4)(C) when it imposed a term of seven years to life on count 4. That sentence was permissible only if Matters was convicted "of attempting to dissuade a witness by use of an implied or express threat of force pursuant to section 136.1, subdivision (c)(1)." (*Lopez*, *supra*, 208 Cal.App.4th at p. 1065.) Matters was not convicted of violating subdivision (c)(1). The court erred in imposing a sentence under section 186.22, subdivision (b)(4)(C) because that section does not apply to the crime of which Matters was convicted, and was based on a fact the jury did not find true.

4.      *Matters's ineffective assistance of counsel assertion fails.*

Before sentencing, Matters's counsel requested that the court grant Matters probation, or in the alternative, modify the judgment by striking the section 186.22 , subdivision (b)(4) allegation to avoid the necessity of imposing a seven year to life term on count 4. In support of her request, Matters's attorney argued that numerous mitigating circumstances warranted

---

limited to violations of section 136.1 involving force or threat. Rather, the only legal question raised was whether section 136.1, subdivision (b)(1) was intended only to cover the prevention or dissuasion of someone from reporting a crime of which they were a victim. (*Galvez*, at p. 1258.) It is axiomatic that a case is not authority for a proposition it does not address. (See *People v. Knoller* (2007) 41 Cal.4th 139, 155 ["'An appellate decision is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided."'"].)

a lesser sentence.[11]  But Matters's attorney did not request that the section 136.1, subdivision (a)(2) "wobbler" be reduced to a misdemeanor under section 17, subdivision (b).  Stating its personal belief that a lesser sentence was warranted for the count 4 charge, the trial court nevertheless appropriately acknowledged it lacked the authority to strike the section 186.22, subdivision (b)(4) allegation.  Matters contends his defense attorney rendered ineffective assistance by failing to ask the trial court to reduce the felony offense to a misdemeanor pursuant to section 17, subdivision (b).  We disagree.

"Ineffective assistance of counsel claims are rarely cognizable on appeal."  (*People v. Silvey* (1997) 58 Cal.App.4th 1320, 1329.)  "We are wary of adjudicating claims casting aspersions on counsel when counsel is not in a position to defend his conduct.  A claim of ineffective assistance of counsel instead is more appropriately made in a habeas corpus proceeding."  (*People v. Hinds* (2003) 108 Cal.App.4th 897, 902.)  We will reverse a conviction on the ground of inadequate representation only if the appellate record affirmatively discloses that counsel had no tactical purpose for his or her allegedly improper actions.  (*People v. Hart* (1999) 20 Cal.4th 546, 589, fn. 8.)  In all other cases, the conviction will be affirmed and the defendant relegated to habeas corpus proceedings, in which evidence may be taken to determine the basis, if any, for counsel's conduct or omission.  (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.)

"'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.]

---

[11] Counsel identified the following factors:  (1) Matters's prior criminal history involved only three prior juvenile adjudications, two involving vandalism and one involving an altercation in sixth grade; (2) Matters, 20 years old when the current offense was committed, had committed no other offenses as an adult; (3) the jury found that count 4 did not involve violence or a threat of violence; (4) Matters's involvement in the charged crimes was minimal compared to Yun, Cardenas and Zuniga; (5) Yun would receive a determinate term, while Cardenas and Zuniga each received only five-year terms; (6) Matters was not a gang member; and (7) the extenuating circumstances under which Matters made the call to Brown.

Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [Citations.]'" (*In re Harris* (1993) 5 Cal.4th 813, 832–833.) "'It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. . . .'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 217.) If an insufficient showing either of deficient performance or prejudice is made, the ineffective assistance claim fails. (*People v. Foster* (2003) 111 Cal.App.4th 379, 383.) Appellant bears the burden to demonstrate the inadequacy of his trial counsel by a preponderance of the evidence. (*Ledesma*, at p. 218.)

Where a claim of ineffective assistance is raised on appeal and where, as here, "'the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." [Citation]'" (*People v. Osband* (1996) 13 Cal.4th 622, 700–701.) Although the record here contains no explanation for his trial attorney's challenged behavior, Matters insists there can be no explanation for her failure to seek a reduction of the offense to a misdemeanor. The Attorney General, on the other hand, argues that the record sheds no light as to why counsel failed to request that the witness intimidation conviction be reduced to a misdemeanor, and that, in any case, counsel may reasonably have decided not to do so "because it would have been futile given the trial court's statements and sentencing decisions."

From this record we cannot ascertain counsel's motivation for not seeking the reduction, but we also cannot definitively say there can be no satisfactory explanation. The trial court observed that, although Matters was guilty only of witness intimidation, that crime is quite serious given the rampant nature of gang violence in society, and gang use of fear and intimidation to victimize communities. Accordingly, the penalties associated with witness intimidation in gang-related crimes are meant to be harsh in order to send a message

26

and try to "change the way that gangs are able to operate in the community and give the communities a vehicle for fighting back." The court also observed that it was not inclined "to totally disregard the jury's true finding of the gang allegation," and said that, if it had the discretion to strike the section 186.22, subdivision (b)(4) "enhancement," it would instead impose the five-year punishment for serious felonies under section 186.22, subdivision (b)(1)(B).

The record reflects the trial court found Matters's offense quite serious. It does not follow that just because the court did not believe a seven-year-to-life sentence was warranted, the court would necessarily have been inclined to reduce the conviction to a misdemeanor. Indeed, the court's desire to enhance Matters's sentence by five years under section 186.22, subdivision (b)(1) is a strong indication to the contrary, and that it would have found a lesser sentence inappropriate. The court's statements and rationale regarding its sentencing decisions demonstrate it would likely have been futile for Matters's counsel to seek a reduction of the conviction to a misdemeanor. Matters's speculation that there was no reasonable tactical or strategic reason for his attorney's failure to request the reduction does not establish ineffective assistance of counsel. (See *People v. Mattson* (1990) 50 Cal.3d 826, 876–877 [criminal appellant must establish, based on facts and record on appeal, and not speculation, that trial counsel rendered ineffective assistance].) Matters has made an insufficient showing of deficient performance. His claim of ineffective assistance fails.

5. *The court was not required to give accomplice instructions pertaining to Matters.*

Yun maintains the trial court erred by failing to instruct the jury sua sponte that Matters was an accomplice whose testimony must be corroborated and viewed with caution. We disagree.

Matters testified that when Yun and the other men arrived at the park, Yun began throwing up gang signs and said, "Sangra." The group approached Brown and D'Amato, and an exchange took place about whether Brown was "from T.F.O." When some members of the group began beating D'Amato, Brown ran off, followed by several men, including Yun. Matters claimed he left the park when D'Amato was attacked and never saw the attack

27

on Brown. He said he never saw Yun with any weapon, and never saw him cut anyone. Matters claimed he took part in no attack and never acted as a lookout. Matters testified that he was surprised when he got a call from Yun instructing him to "switch up [his] story" about what had happened in the park, and to make sure that Yun was "not . . . in it." Matters admitted he felt threatened by Yun and was afraid of Yun and the Sangra gang.

A defendant may not be convicted "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111.) An accomplice is "one who is subject to prosecution for the identical offense charged against the defendant. (§ 1111.)" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 105.) The instruction at issue is CALCRIM No. 334 which cautions the jury to view accomplices with caution.[12] Yun did not request

---

[12] CALCRIM No. 334 states: Before you may consider the (statement/ [or] testimony) of _____ <insert name[s] of witness[es]> as evidence against (the defendant/ _____<insert names of defendants>) [regarding the crime[s] of _____ <insert name[s] of crime[s] if corroboration only required for some crime[s]>], you must decide whether _____ <insert name[s] of witness[es]>) (was/were) [an] accomplice[s] [to (that/those) crime[s]]. A person is an *accomplice* if he or she is subject to prosecution for the identical crime charged against the defendant. Someone is subject to prosecution if:

1.      He or she personally committed the crime;

OR

2.      He or she knew of the criminal purpose of the person who committed the crime;

AND

3.      He or she intended to, and did in fact, (aid, facilitate, promote, encourage, or instigate the commission of the crime[;]/ [or] participate in a criminal conspiracy to commit the crime).

The burden is on the defendant to prove that it is more likely than not that _____ <insert name[s] of witness[es]> (was/were) [an] accomplice[s].

[An accomplice does not need to be present when the crime is committed. On the other hand, a person is not an accomplice just because he or she is present at the scene of a

instructions on accomplice testimony. He claims now that the trial court had a sua sponte duty to so instruct.

---

crime, even if he or she knows that a crime will be committed or is being committed and does nothing to stop it.]

[A person who lacks criminal intent but who pretends to join in a crime only to detect or prosecute those who commit that crime is not an accomplice.]

[A person may be an accomplice even if he or she is not actually prosecuted for the crime.] [¶] . . . [¶]

If you decide that a (declarant/ [or] witness) was not an accomplice, then supporting evidence is not required and you should evaluate his or her (statement/ [or] testimony) as you would that of any other witness.

If you decide that a (declarant/ [or] witness) was an accomplice, then you may not convict the defendant of _____ <insert charged crime[s]> based on his or her (statement/ [or] testimony) alone. You may use the (statement/ [or] testimony) of an accomplice to convict the defendant only if:

1. The accomplice's (statement/ [or] testimony) is supported by other evidence that you believe;

2. That supporting evidence is independent of the accomplice's (statement/ [or] testimony);

AND

3. That supporting evidence tends to connect the defendant to the commission of the crime[s].

Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime[s], and it does not need to support every fact (mentioned by the accomplice in the statement/ [or] about which the accomplice testified). On the other hand, it is not enough if the supporting evidence merely shows that a crime was committed or the circumstances of its commission. The supporting evidence must tend to connect the defendant to the commission of the crime.

[The evidence needed to support the (statement/ [or] testimony) of one accomplice cannot be provided by the (statement/ [or] testimony) of another accomplice.]

Any (statement/ [or] testimony) of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that (statement/ [or] testimony) the weight you think it deserves after examining it with care and caution and in the light of all the other evidence.

29

The court was not required to instruct sua sponte on accomplice testimony because Matters was a testifying codefendant who denied his guilt. As such, Yun had to request the instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 562 (*Avila*).) Moreover, such an instruction would have been improper here because Matters's testimony exculpated Yun.

"Ordinarily, the instructions on accomplice testimony need be given on the court's own motion only when the accomplice witness is called by the People [citations] or when a defendant in testifying implicates his codefendant while confessing his own guilt [citation]. In the latter instance, the confession on the stand, for all practical purposes, relieves the jury of the decision whether the declarant was an accomplice. When a defendant has confessed his guilt, there is little need to worry about prejudicing him by giving an accomplice testimony instruction for the protection of his codefendant. Here, [defendant] testified on her own behalf, not as a prosecution witness, and denied her guilt. Thus, it was not incumbent to give the accomplice testimony instructions. [Citation.]" (*People v. Terry* (1970) 2 Cal.3d 362, 399 (*Terry*).)

In *People v. Ramos* (1982) 30 Cal.3d 553 (*Ramos*), the Court explained that, when "a codefendant testifies that he was not involved in the crime—and thus that he was not an accomplice—the trial court may properly conclude that the giving of accomplice instructions might improperly prejudice the codefendant's case. *Terry*, *supra*, 2 Cal.3d 362 indicates that in such a situation the giving or withholding of such instructions lie within the sound discretion of the trial court." (*Ramos*, at p. 582, reversed on other grounds by *California v. Ramos* (1983) 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed.2d 1171].) In the past, the Supreme Court held that the trial had a duty to instruct the jury sua sponte to view incriminating accomplice testimony with distrust, regardless of which party calls the accomplice as a witness. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.) The Supreme Court has since clarified that when the testifying accomplice is a codefendant, an accomplice instruction must be given only "when requested by a defendant." (*People v. Box* (2000) 23 Cal.4th 1153, 1209, disapproved on other grounds by *People v. Martinez* (2010) 47 Cal.4th 911, 948, fn. 10.) The courts have "not disturbed the long-standing rule that an accomplice instruction

need not be given sua sponte when the testifying accomplice is a codefendant." (*People v. Smith* (2005) 135 Cal.App.4th 914, 928, overruled on other grounds in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291.)

Here, Matters was a codefendant who testified on his own behalf and denied guilt of any crime. His defense was that he was not present for and did not participate in an attack on Brown. He also claimed he did not by force or threat, attempt to dissuade Brown from testifying, and called Brown only because he was afraid for himself and his family. To instruct the jury about accomplices in respect to Matters's testimony might have been prejudicial to his case. The trial court had no sua sponte duty to give accomplice instructions. (Cf. *Ramos*, *supra*, 30 Cal.3d at p. 582; *Terry*, *supra*, 2 Cal.3d at pp. 398–399.)

Further, we agree with the Attorney General that it would have been improper for the trial court to give CALCRIM No. 334 here because Matters's testimony exculpated Yun. Matters denied that he or Yun took part in the attacks on Brown or D'Amato. He testified only that, at the park, Yun threw gang signs and said, "Sangra." Matters maintained that he never saw Yun with a weapon or saw him cut anyone. He claimed that Cardenas and Zuniga instigated the attacks.

Further, even were we to find the court erred in failing to give an accomplice instruction, that error would be harmless in this case. There is no reasonable probability the jury's verdict would have been any different had accomplice instructions been given. A trial court's failure to instruct on the requirement of corroboration is harmless if the record reveals sufficient evidence to corroborate the accomplice's testimony. (*People v. Williams* (2008) 43 Cal.4th 584, 637–638.) "The corroborating evidence may be entirely circumstantial. . . . The corroborating evidence may be "'slight and entitled to little consideration standing alone.'" [Citations.] Only a portion of the accomplice's testimony need be corroborated, and the corroborative evidence need not establish every element of the charged offense. . . . [Citation.] All that is required is that the evidence ""'"connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the

[accomplice] is telling the truth.'"''"'" (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 25; see also *Williams*, *supra*, 43 Cal.4th at p. 638.)

Brown testified that Yun threw gang signs at the park before the attacks. Brito testified that Yun did not participate in the assault on D'Amato, and she did not see him with a weapon. Zuniga denied seeing anyone with a knife or blade, and he and Cardenas each testified that only they were involved in a fight with Brown and D'Amato. Cardenas claimed Yun ran away and was not involved in the fights at all. The court's failure to give accomplice instructions was harmless error, if any, because Yun was not prejudiced by the absence of the instruction. It is not reasonably probable that the verdict would have been any different had the instruction been given. An instruction advising jurors to view any testimony by Matters's "that tend[ed] to incriminate" Yun with caution, and which required even slight corroboration of such testimony would have had little effect given Matters's minor role at trial in establishing Yun's guilt. Testimony by Brown and D'Amato overwhelming established Yun's guilt in the charged offenses. They testified that Yun was involved in, and indeed led, the attacks. Brown testified that Yun used a box cutter as a weapon to slash Brown's arm. Thus, even without Matters's testimony, the prosecution's case included powerful evidence that Yun led or at least participated in the assaults at the park. To the extent Matters's testimony had any impact, it actually exculpated Yun, as Matters denied both his own and Yun's involvement. Thus, even if the court erred by failing to give accomplice instructions, the error was harmless. (See *People v. Box*, *supra*, 23 Cal.4th at p. 1209.)

6.     *The court did not err by permitting photographic evidence of Yun and other gang members and jail cell graffiti.*

Over defense objections, the trial court admitted a photograph depicting 10 Sangra gang members, including Yun (group photo). In the group photo, Yun exposes part of a Sangra gang tattoo on his stomach, two individuals pose with guns and others flash Sangra hand signs. Also over defense objections, the trial court permitted Nakamura to testify that

Yun did Sangra graffiti while in a jail cell in which he was held for an hour after his arrest, and admitted two photographs of that graffiti ("graffiti photos").

Yun asserts the trial court abused its discretion and that the group and graffiti photos should have been excluded. He argues the evidence implicated him of guilt by association, was unnecessarily cumulative regarding his gang membership and was substantially more prejudicial than probative. He maintains there is a reasonable probability the outcome would have been more favorable to him if the photographic evidence had been excluded, mandating reversal of the judgment.

We review the trial court's ruling for abuse of discretion. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 275.) We conclude the trial court did not abuse its discretion in admitting the group photo, or the graffiti photos and Nakamura's related testimony.

Evidence Code section 352 (section 352) gives the court discretion to exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Yun asserts that the probative value of the photographs was substantially outweighed because the evidence was highly inflammatory and cumulative in that: (1) the risk of the jury finding him guilty by association, given the inflammatory nature of the evidence was extreme, and (2) the photographs were unnecessary to establish his membership in the Sangra gang.

The trial court did not abuse its discretion by concluding that the probative value of the photographs was not substantially outweighed by their potential to inflame the jury. The photographs were probative of Yun's membership in or association with the Sangra gang. The group photo, which depicts Yun wearing a Sangra gang tattoo and others flashing Sangra gang signs, was relevant to Valdez's expert testimony regarding Sangra gang signs and gang cliques. The graffiti photos show the letters "SG SKS," which Valdez testified stand for the "Sickos" clique of the Sangra gang.

We are not persuaded by Yun's argument that the photos are unduly prejudicial or inflammatory because they associate him with the Sangra gang. To the extent the jury was

33

likely to have an adverse emotional reaction to Yun based on the photos, the jury was likely already inclined to have such a reaction based on the uncontradicted testimony regarding Yun's affiliation with the Sangra gang. (Cf., *People v. Heard* (2003) 31 Cal.4th 946, 976–978 [gory crime scene photographs did not inflame or impermissibly sway jury in light of detailed testimony regarding crime scene and victims]) Given the damaging nature of the evidence and societal bias against street gangs, some risk of such a reaction was inevitable.

Also, given the highly probative value of the photographs, we cannot say that the trial court abused its discretion when it concluded that their probative value was not substantially outweighed by the risk of undue prejudice. "'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. . . . Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.'" [Citation.]'" (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.)

Finally, Yun argues the photos were unduly consumptive of time, because they corroborated the victims' and other witnesses' testimony. (*People v. Farnam* (2002) 28 Cal.4th 107, 185–186.) Even if the challenged photos are repetitious of other evidence on the point of Yun's gang membership that was already before the jury, we do not find they were prejudicial or inflammatory. Such cumulative evidence could not have unduly prejudiced Yun. Under the circumstances, there was no abuse in admitting the photos. Accordingly, we reject Yun's assertion that the trial court abused its discretion under section 352 by admitting the gang and group photos.

7. *The trial court did not err by excluding evidence of the hung jury in the trial of Cardenas and Zuniga.*

Zuniga was tried before Matters and Yun. After Zuniga's trial ended in a hung jury, he decided to plead no contest to assault in order to "get this thing over," and avoid another

34

trial. Cardenas was tried with Zuniga. At trial, Cardenas asked two witnesses to lie on his behalf and to testify that he was with them, not at the park, during the fights. After the mistrial, Cardenas also entered a plea of no contest. In the instant case, Zuniga and Cardenas testified that Brown and D'Amato started the fight at the park, and that they came to Yun's defense. The trial court refused to permit Yun to introduce evidence that the jury in Zuniga's trial was unable to reach a decision.[13] The court explained that, allowing Zuniga to say anything other than that "he went through a trial and he pled guilty" might "prejudice one jury by telling them the outcome of another case." Yun contends that evidence that the jury in Zuniga and Cardenas's trial hung was relevant and, if admitted, would have assisted him and the court committed reversible error by excluding that evidence.

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) "Relevant evidence" is "evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) But, even relevant evidence may be excluded if the trial court concludes that "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

Yun relies on *People v. Griffin* (1967) 66 Cal.2d 459 (*Griffin*). In *Griffin*, the defendant was convicted of murdering a woman after attempting to rape her. (*Id.* at p. 461.) The trial court admitted evidence that, before the defendant was arrested for the murder, he had fled to Mexico, where he was charged with, but acquitted of, raping another woman. (*Id.* at p. 463.) The Supreme Court held that the evidence of the second attack was admissible

---

[13] Yun did not attempt again to admit evidence of the hung jury before D'Amato testified. But Yun has not forfeited this issue as to D'Amato. It would have been futile for him to re-raise the issue, given the court's decision to exclude the same evidence as to Brown. (*People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 647–648 [claim of error preserved where objection would have been futile].)

"because the similarities between the crimes made evidence of the later crime relevant to prove that [the murder victim's] injuries were not accidental but inflicted by defendant and to prove that he intended to rape her." (*Id*. at pp. 464–465.) The court concluded, however, that it was prejudicial error to exclude evidence that defendant was acquitted of the rape charge in Mexico in connection with the second attack, because this evidence would help the jury assess what weight to give the evidence of the rape accusation. (*Id*. at pp. 465–466.)

The so-called "*Griffin* rule" has been summarized as follows: "[I]f a trial court permits the prosecution to present evidence that the defendant committed one or more similar offenses for which he or she is not charged in the current prosecution, the trial court must also allow the defense to present evidence of the defendant's acquittal, if any, of such crimes, and failure to allow such acquittal evidence constitutes error." (*People v. Mullens* (2004) 119 Cal.App.4th 648, 664–665 [extending *Griffin* rule to evidence of sexual offenses admissible under Evid. Code, § 1108 to show propensity]; see also *People v. Jenkins* (1970) 3 Cal.App.3d 529, 533–535 [error, though not prejudicial, to admit evidence that codefendant was arrested for crime similar to charged offense to show intent, where evidence that similar charge had not been prosecuted was excluded].)

Yun's reliance on *Griffin*, *supra*, 66 Cal.2d 459 is misplaced. In *Griffin*, the prosecution presented evidence indicating the defendant committed offenses similar to the one for which he was on trial. The court held the defendant was entitled to present evidence of his acquittal, if any, of such crimes. (*Id*. at p. 466.) *Griffin* did not involve the relevance and admissibility of one defendant's guilty plea to prove the innocence of another defendant. Rather, *Griffin* held that where a court properly admitted evidence of a defendant's other misconduct to prove a material issue related to the charged offense (see Evid. Code, § 1101, subd. (b)), it was error to exclude evidence that the defendant was acquitted of that other misconduct because the acquittal has a tendency to rebut the prosecution's evidence. (*Id*. at pp. 465–466.)

The *Griffin* rule does not assist Yun because evidence that Zuniga and Cardenas's jury was unable to reach a verdict does not bear on Yun's guilt or innocence. Here, it was

36

the trial of Zuniga and Cardenas at issue. Unlike the defendant in *Griffin*, Yun was not involved in Zuniga and Cardenas's trial, nor was there a factual finding of his innocence of any uncharged crime. The trial court properly excluded evidence of Zuniga and Cardenas's hung jury.

8.      *Yun has failed to demonstrate cumulative error.*

Yun contends his conviction must be reversed for cumulative error. "Because we identified [at most one possible] harmless error . . . the claim of cumulative error is without merit." (*People v. Vieira* (2005) 35 Cal.4th 264, 305; see also *People v. Richie* (1994) 28 Cal.App.4th 1347, 1364, fn. 6 ["Since we have found only one error properly preserved for appeal, we need not address appellant's contention that cumulative error at trial requires reversal"].)

9.      *Enhancements imposed under section 667.5, subdivision (b) must be stricken.*

At sentencing, the trial court imposed against Yun a five-year term under section 667, subdivision (a)(1), and imposed, but stayed, a section 667.5, subdivision (b), one-year enhancement for the prior prison term. Yun's final contention of error is that the trial court erred when it imposed both a consecutive five-year enhancement under section 667, subdivision (a)(1) for the felony conviction which gave rise to the prior prison term, and the one-year enhancement under section 667.5, subdivision (b), for the same prior offense. The Attorney General concedes the issue and agrees the abstract of judgment should be corrected. The court should have stricken, not stayed, the one-year section 667.5, subdivision (b), enhancement. (See *People v. Perez* (2011) 195 Cal.App.4th 801, 805; *People v. Jones* (1993) 5 Cal.4th 1142, 1152–1153.)

Under section 1385, subdivision (a), a prior prison term enhancement must be imposed or stricken. (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1561–1562.) But, if the court finds that the same prior conviction violates both sections 667, subdivision (a)(1) and 667.5, subdivision (b), it may impose only the greater enhancement. The lesser enhancement must be stricken. (*People v. Jones*, *supra*, 5 Cal.4th at pp. 1152–1153.)

Here, the abstract of judgment lists a second one-year enhancement under section 667.5, subdivision (b), as stayed. As to count 5, the clerk's minutes reflect that enhancements under sections 667, subdivision (a)(1) and 667.5, subdivision (b), were ordered stayed, which is not what the court stated on the record. The clerk's minutes are incorrect. Only one enhancement under section 667, subdivision (a)(1), should have been imposed, because Yun's sentence is composed of determinate terms. (See *People v. Williams* (2004) 34 Cal.4th 397, 401–405 [five-year priors imposed for each indeterminate term].) An enhancement pursuant to section 667, subdivision (a)(1) was imposed orally by the court at the end of the pronouncement of sentence. The enhancements were improperly imposed as to count 5, and the second one-year enhancement under section 667.5, subdivision (b), should have been stricken not stayed.[14] The unauthorized sentence may be corrected on appeal. (See *People v. Scott* (1994) 9 Cal.4th 331, 354.)

---

[14] Yun was convicted in counts 5 and 6 of assault by means of force likely to cause great bodily injury, but the abstract of judgment incorrectly indicates he was convicted of assault with a deadly weapon. We will order this clerical error corrected. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186–187.) The abstract also incorrectly reflects that the court imposed two prior prison term enhancements, even though the court imposed and stayed only one prior prison term enhancement. As discussed above, the prior prison term enhancement must be stricken.

## DISPOSITION

As to Bobby Matters, the matter is remanded to the trial court for resentencing as to count 4, and to prepare a new abstract of judgment reflecting the sentencing change.  As to John Lee Yun, the matter is remanded and the trial court is directed to prepare an amended abstract of judgment reflecting correction of clerical errors, as follows:  (1) in item 1, the abstract of judgment shall reflect that, as to counts 5 and 6, Yun was convicted of assault by means of force likely to cause great bodily injury, and (2) in item 3, the prior prison term enhancements imposed but stayed pursuant to Penal Code section 667.6, subdivision (b) shall be stricken.  The court shall cause certified copies of the amended abstracts of judgment to be forwarded to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


MALLANO, P. J.


ROTHSCHILD, J.


39